Filed 8/18/20  P. v. Arce CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>IRVIN ARCE,<br><br>    Defendant and Appellant. | B296720<br>(Los Angeles County<br> Super. Ct. No. NA104936) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jesse I. Rodriguez, Judge.  Affirmed.

Cynthia L. Barnes, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey and Steven D. Matthews, Supervising Deputy Attorneys General, and Ryan M. Smith, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted appellant Irvin Arce of two counts of attempted murder (Pen. Code, §§ 664/187, subd. (a)),[1] one count of cutting a utility line (§ 591), and one count of disobeying a domestic relations court order (§ 273.6, subd. (a)).  On the first count of attempted murder, the jury found true the allegation that defendant attempted to commit a willful, deliberate, and premeditated murder (§ 664, subd. (a)).  On both counts of attempted murder, the jury found true the allegations that defendant personally used a deadly and dangerous weapon, to wit, a knife, and personally inflicted great bodily injury (§§ 12022, subd. (b)(1), 12022.7, subd. (a)).  In a bifurcated proceeding, defendant admitted he had been convicted of robbery as a minor, which constituted a prior serious and/or violent felony (§§ 667, subd. (d), 1170.12, subd, (b)).  He was sentenced to a prison term of 28 years four months, plus 14 years to life.

On appeal, defendant contends there is insufficient evidence to support the finding that he intended to kill both victims on the attempted murder counts, and that he premeditated and deliberated the murder of his first victim.  He also contends the court committed error by failing to instruct sua sponte on attempted voluntary manslaughter under a theory of imperfect self-defense, and by denying his motions for a mistrial and new trial.  Finally, defendant contends the court violated his constitutional rights by using a prior juvenile adjudication to enhance his criminal sentence.  We reject defendant's contentions and affirm the judgment.

---

[1]      Unspecified references to statutes are to the Penal Code.

2

# BACKGROUND

## 1. *Charges in Operative Information*

In the first amended information, defendant was charged with the attempted murder of Rosa Briones (Rosa) (§ 664/187, subd. (a), count 1) and Martin Aaron Espinoza (Aaron) (§ 664/187, subd. (a), count 2). The information alleged that both attempted murders were committed willfully, deliberately, and with premeditation (§ 664, subd. (a)), that defendant personally used a deadly weapon, to wit, a knife (§ 12022, subd. (b)(1)), and that defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)). Defendant was also charged with cutting a utility line (§ 591, count 3) and disobeying a domestic relations court order (§ 273.6, subd. (a), count 4).

The information further alleged that in 2000, when defendant was 17 years old, defendant was convicted of robbery (§ 211), which constituted a serious and/or violent felony (§§ 667, subd. (d), 1170.12, subd. (b)).

## 2. *Prosecution Evidence*

Sandra Briones (Sandra) testified that despite the existence of a 10-year restraining order protecting her from defendant, she allowed defendant to live with her in an apartment with their two children and her mother. Amidst ongoing conflict, Sandra kicked defendant out of the apartment on the morning of August 14, 2016. After leaving for the day, defendant returned around 10:00 p.m. and demanded that Sandra come outside to talk with him. Sandra refused, and defendant walked

3

down the apartment stairs, at which point Sandra realized the electricity to the apartment had been cut off.[2] When defendant returned to the apartment door, he told Sandra that he would not turn on the electricity unless she talked with him outside. When Sandra again refused, defendant left, telling Sandra "now you have something coming."

Sandra's mother called her sister, Rosa, to try to get the electricity reconnected. Rosa testified that she and her boyfriend, Aaron, drove to the apartment and parked her car across an adjacent alleyway. The couple walked toward the electrical panel located in the alleyway near the rear of the apartment.

Suddenly, Rosa saw a car coming at her "fast." She jumped back inside a gated area of the apartment and watched as defendant drove his truck into the alleyway. Rosa testified that defendant yelled through his car window to "get your fucken' sister down here." After Rosa responded that she did not "think it was a good time," she heard defendant and Aaron "bickering back and forth" about the electricity. Fearing the situation would escalate, Rosa stepped behind defendant's truck and dialed 911.

While Rosa was describing defendant's truck to the 911 operator, defendant drove down the alleyway. Rosa watched defendant get out of his truck and climb over a fence. He pulled something "as if he was turning [the electricity] on." Then defendant got back into his truck.

---

[2] According to Sandra, defendant had previously shut off the power to the apartment when he got upset with her.

4

Rosa followed Aaron as he walked toward her car. While she was walking, Rosa looked over and saw that defendant had backed up his truck so that it was next to her. After passing by the driver's side door, Rosa turned around and realized defendant had exited the truck. Moments after Rosa turned again to walk away, she felt what she thought was a punch to her mid back, followed by more punches "going over me and on me."

Aaron heard Rosa yell his name, and he ran back to intervene. While Aaron struggled with defendant, Rosa managed to escape toward the rear area of defendant's truck. She looked back for Aaron, who was hunched over and reaching for his arm while defendant continued to swing at him. Rosa quickly realized defendant's "motions weren't punches, but [were] stabbing motion[s]." According to Rosa, when she reached for her back, "my whole hand was completely full of blood." Rosa ran to Aaron and pulled him away from defendant, after which Aaron lost consciousness. Still on the phone with the 911 operator, Rosa said that she and Aaron had been stabbed.

Meanwhile, defendant got back into his truck and drove away. Three days later, his abandoned truck and wallet were located by the Long Beach Police Department.[3]

Rosa was hospitalized for stab wounds to her mid back, right torso, and upper extremities. Though the doctor who testified about Rosa's condition stated that he could not recall the specific number of

---

[3]     Defendant fled the state. In 2018, he was extradited back to California from Oregon.

5

stab wounds to her body because it was "too many to count," the doctor noted that the stab wounds to her back caused a collapsed lung and liver damage. Aaron was also hospitalized; he suffered 17 stab wounds and a broken left arm. Because Aaron's blood loss endangered his life, he received massive blood transfusions to replace his entire blood volume.

3.  *Defense Evidence*

Defendant testified that on August 13, 2016, he woke up in the apartment building garage (where he had been living for one month)[4] and saw that his belongings had been scattered on the apartment complex floor. After collecting his clothes, defendant knocked on the apartment door. When Sandra told defendant that she no longer wanted him there, defendant left.

Sometime after 10:00 p.m., defendant drove his truck back to the apartment garage. When he arrived, Rosa and Aaron were already in the alleyway; they began to yell at him about the electricity. Defendant told Rosa that he would fix the problem even though he had not turned off the electricity. Defendant got out of his truck and changed a fuse in the electrical panel. Aaron followed defendant and told him that "he was there to handle me and take care of me."

Aaron continued to "bark" as defendant walked back to his truck, and defendant told Aaron he "need[ed] to just back off." When

---

[4]     Defendant testified that he slept in the garage after Sandra had accused him of infidelity.

6

defendant got into his truck, Aaron struck him and told him to come out of the truck.

According to defendant, he got out of the truck and "exchanged blows" with Aaron. Then, "immediately [Rosa] jumps in. And now I got both of them on me. He has me by the throat, she has me by the hair. And, as they said, there was minimal space. . . . And at that point I felt both of them on me. And I always carry my work knife, a pocket knife, and I did take it out. And I started strucking [*sic*] them." Because Aaron was strangling defendant while defendant was "going down," defendant believed his life was in danger. Aaron refused to let go of defendant even after defendant stabbed him with his knife. According to defendant, when Aaron finally let go of him, Rosa "falls into place. And that's when she got struck. I didn't realize she got struck also." When both Rosa and Aaron let go of defendant, he stopped immediately, got into his truck, and drove away "[a]s far as I could" go.

4. *Verdict and Sentence*

On count 1, attempted murder of Rosa, the jury found defendant guilty and found that the attempted murder was committed willfully, deliberately, and with premeditation. On count 2, attempted murder of Aaron, the jury found defendant guilty of attempted murder and found not true the allegation that the attempted murder was premeditated. On both counts, the jury found defendant had personally used a deadly weapon and personally inflicted great bodily injury.

On counts 3 and 4 (cutting a utility line and disobeying a domestic relations court order), the jury found defendant guilty.

In a bifurcated proceeding, defendant admitted he had suffered a prior serious and/or violent felony (§§ 667, subd. (d), 1170.12, subd. (b)) for a robbery conviction in 2000 while he was 17 years old.

The court denied defendant's motion to strike his prior juvenile robbery conviction (see *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497), and sentenced him to an overall determinate term of 28 years four months imprisonment, plus 14 years to life in prison.[5] The court imposed various fines, fees, and assessments.

## DISCUSSION

1. *Sufficiency of the Evidence to Sustain the Attempted Murder Counts*

Defendant contends there is insufficient evidence to support the findings that he intended to kill both victims and that he premeditated the murder of Rosa. "'When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a

---

[5] Defendant was sentenced to 22 total years on count 2, the principal determinate term (the upper term of 9 years, multiplied by 2 for the prior strike, plus 4 years for the great bodily injury and personal use of a deadly weapon enhancements); 1 year 4 months on count 3 (one third the middle term of 2 years multiplied by 2 for the prior strike); 1 year on count 4; and 14 years to life (the middle term of 7 years to life multiplied by 2 for the prior strike) plus a determinate term of 4 years for the great bodily injury and personal use of a deadly weapon enhancements.

8

reasonable doubt.' [Citation.]" (*People v. Gomez* (2018) 6 Cal.5th 243, 278.) We presume in support of the judgment ""'the existence of every fact the jury could reasonably have deduced from the evidence.'" [Citation.]" (*Ibid.*) We do not resolve credibility issues or evidentiary conflicts; the relevant inquiry is whether, in light of all the evidence, a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (*Ibid.*)

"'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.] Hence, in order for defendant to be convicted of the attempted murder of [either victim], the prosecution had to prove he acted with specific intent to kill that victim. [Citation.]" (*People v. Smith* (2005) 37 Cal.4th 733, 739.) "Because direct evidence of a defendant's intent rarely exists, intent may be inferred from the circumstances of the crime and the defendant's acts. [Citation.]" (*People v. Sanchez* (2016) 63 Cal.4th 411, 457 (*Sanchez*).)

An attempt to commit murder that is willful, deliberate, and premeditated is punished by a greater term of imprisonment than an unpremeditated attempted murder. (*People v. Favor* (2012) 54 Cal.4th 868, 876–877; see § 664, subd. (a).) "Deliberation" refers to "'careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.]' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 812.) ""'The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is

9

the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]" [Citation.]'" (*People v. Houston* (2012) 54 Cal.4th 1186, 1216.)

A reviewing court typically considers three categories of evidence when determining whether a finding of premeditation and deliberation is adequately supported:  "(1) evidence of planning activity prior to the killing, (2) evidence of the defendant's prior relationship with the victim from which the jury could reasonably infer a motive to kill, and (3) evidence that the manner in which the defendant carried out the killing 'was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).'" (*People v. Brooks* (2017) 3 Cal.5th 1, 58–59, quoting *People v. Anderson* (1968) 70 Cal.2d 15, 26–27.)  These factors serve as an aid for reviewing courts "in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 (*Perez*).)

Here, the evidence is sufficient to support the jury's finding that defendant attempted to commit a premeditated murder of Rosa.  The prosecution's evidence supports a finding of planning activity.  While Rosa was walking, defendant backed up his truck so that it was next to her, got out when she passed, and began stabbing her in the back from behind.  The evidence also supports a finding of motive: defendant was

10

angry after Rosa had disregarded his command to summon her sister outside so that he could continue his argument over his living situation. The manner with which defendant attacked Rosa—stabbing her in the back multiple times and continuing to stab her on the ground—suggests that he was stabbing her in a manner intended to kill her. In sum, the evidence demonstrates that defendant considered his course of conduct and decided to murder Rosa. (*Perez, supra*, 2 Cal.4th at p. 1125.)

Substantial evidence also supports the jury's finding that defendant intended to kill Aaron. He stabbed Aaron 17 times as Aaron tried to help Rosa. Without mass blood transfusions, Aaron would have died from his wounds. Following his attack, defendant fled the scene in his truck. (See *People v. Moon* (2005) 37 Cal.4th 1, 28 [flight from the crime scene can evidence intent to kill].)[6] The foregoing circumstances support the finding that defendant intended to kill Aaron. (*Sanchez, supra*, 63 Cal.4th at p. 457.)

2.   *The Failure to Instruct on Attempted Voluntary Manslaughter Based on Imperfect Self-Defense*

With regard to the attempted murder counts, the jury was instructed on the defense of reasonable self-defense,[7] as well as the

_____

[6]   The jury was instructed that it could consider defendant's flight to show that he was aware of his guilt.

[7]   The jury was instructed on the following self-defense CALCRIM instructions: the right to self-defense (No. 3470), mutual combat or initial aggressor (No. 3471), the right of self-defense may not be contrived (No. 3472), and the right to use force ends when danger no longer exists or the

11

lesser included offense of attempted voluntary manslaughter based on a sudden quarrel or heat of passion. Defendant did not request, and the trial court did not give, an instruction on attempted voluntary manslaughter based on imperfect self-defense. Defendant maintains that the trial's failure to instruct the jury on imperfect self-defense constituted reversible error.

Attempted voluntary manslaughter is a lesser included offense of attempted murder. (*People v. Prunty* (2015) 62 Cal.4th 59, 69.) Attempted voluntary manslaughter based on imperfect self-defense, one of two types of attempted voluntary manslaughter, arises when the defendant attempts to kill someone in the unreasonable but good faith belief in having to act in self-defense in the face of imminent death or great bodily injury. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116; *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708.)

A trial court must instruct sua sponte on all theories of a lesser included offense that are supported by substantial evidence, but not those without evidentiary support. (*People v. Huggins* (2006) 38 Cal.4th 175, 215.) "The testimony of a single witness, including the defendant, can constitute substantial evidence requiring the court to instruct on its own initiative." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.)

Defendant contends that his testimony was sufficient to support an instruction on imperfect self-defense. We need not address this contention, as we conclude any error was harmless. (See *People v.*

---

attacker is disabled (No. 3474). Defendant takes no issue with the issuance or scope of the foregoing instructions.

*Breverman* (1998) 19 Cal.4th 142, 178 (*Breverman*) [in a noncapital case, error in failing to instruct sua sponte on lesser offenses is reviewed for prejudice exclusively under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)]; see also *People v. Earp* (1999) 20 Cal.4th 826, 886 [reviewing court need not decide whether substantial evidence supported instructions on lesser included offenses of second degree murder and involuntary manslaughter where any instructional error would necessarily be harmless].)

In defendant's version of events, Aaron was the initial aggressor in an exchange of blows, after which Rosa joined in the fight. Aaron had defendant by the throat, and Rosa had him by the hair. Believing his life was in danger, defendant retrieved his pocket knife and began stabbing them, though he claimed he did not know Rosa had been stabbed until after Aaron released him.

Thus, the key to defendant's theory of imperfect self-defense was that Aaron attacked defendant first, followed by Rosa, and that defendant stabbed them both in the resulting altercation. However, the jury found beyond a reasonable doubt that defendant attempted to commit a willful, deliberate, and premeditated murder of Rosa. In making such finding, the jury necessarily resolved the factual discrepancies related to the imperfect self-defense theory against defendant. That is, by finding defendant had stabbed Rosa after deliberating and premeditating his course of action, the jury necessarily found that defendant initiated the physical assault against her. In doing so, the jury necessarily rejected any version of events in which defendant stabbed the victims in an actual but unreasonable belief that

13

his life was in danger. (See *People v. Seaton* (2001) 26 Cal.4th 598, 664; *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1 [imperfect self-defense cannot be invoked when defendant initiates physical assault or commits a felony which created circumstances under which his adversary's attack was legally justified].) Indeed, the jury rejected all aspects of defendant's version, convicting him on count 3 of cutting the utility line, even though he testified he had not done so. (See *People v. Rogers* (2006) 39 Cal.4th 826, 870 [courts may consider the relative strength of evidence support judgment as opposed to the comparative weakness of evidence supporting a different outcome].) In short, it is not reasonably probable that, had the trial court instructed on imperfect self-defense, a different verdict on the attempted murder counts would have been reached. (*Breverman*, *supra*, 19 Cal.4th at pp. 165, 178; *Watson*, *supra*, 46 Cal.2d at p. 836.)

3. *Denying Defendant's Motions for a Mistrial and New Trial*

Defendant contends the trial court's denial of his motions for a mistrial and for a new trial—both of which were based on conduct by Rosa and Sandra during the jury's requested playback of Rosa's 911 phone call—constituted incurable error. We find no error in the court's rulings.

A. *Relevant Proceedings*

During deliberations, the jury asked for a playback of Rosa's 911 phone call. While the audiotape was played in the courtroom, defense counsel interjected and stated that Rosa was sitting in the audience

14

"shedding tears in front of the jury." After a brief pause, the court completed playback of the audiotape and ordered the jury to return to deliberations.

Outside the presence of the jury, the court informed the parties that though it had heard Rosa let out a cry during playback, her crying stopped after defense counsel intervened. The court did not hear any other noise after resuming playback.

Defense counsel argued that the jury was tainted by Rosa's conduct and Sandra's "extreme" display of emotion during playback. The court replied that it did not see Sandra show any emotion, and that it did not believe the jury was tainted. Defense counsel moved for a mistrial or, in the alternative, further admonishment. The prosecution noted the jury had already received an instruction that it could not consider anything other than the evidence presented at trial.[8]

The court denied the motion for a mistrial but agreed to further admonish the jury. After recalling the jurors, the court stated that the jury "may have heard or made an observation about a cry—I am not sure whether you did or not but I am bringing this to your attention—if you did you are to disregard it. You are not to consider that for any purpose. You are to disregard anything you saw or heard outside of this witness stand . . . . [¶] So are there any jurors at this time that . . . believe they are influenced in any degree whatsoever in deciding the evidence, deciding what the facts are and then after that applying the

---

[8] The jury was instructed "to decide what happened, based only on the evidence that has been presented to you in this trial. [¶] Do not let bias, sympathy, prejudice, or public opinion influence your decision."

15

law given to you by the court to those facts?  [¶]  If you believe that you are influenced to such a degree, please raise your hand."  No juror raised his or her hand.  The court questioned whether any juror was "affected in any way whatsoever to the degree that you will be biased" against either party.  No juror raised his or her hand.  When prompted to ask any questions about the further admonishment, no juror asked a question or raised his or her hand.  Finally, the court asked the jurors if they have been influenced "in any way whatsoever."  No juror raised his or her hand or asked a question.

After ordering the jurors back to deliberate, the court stated that based on the jurors' demeanor, it "firmly believe[d] that the jurors have not been influenced in any way."

Following the jury's verdict and during the sentencing hearing, defense counsel moved for a new trial on the same grounds stated in the motion for a mistrial.  Counsel asserted the conduct had prejudiced the jury, which was reflected in the inconsistent verdicts on the premeditation allegations on counts 1 and 2.  The court denied the motion and noted that the verdicts were not inconsistent with the circumstances of the crimes.

B.    *Analysis*

"'A motion for mistrial is directed to the sound discretion of the trial court.  We have explained that "[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.  [Citation.]  Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is

16

vested with considerable discretion in ruling on mistrial motions.'" [Citations.]" (*People v. Gurule* (2002) 28 Cal.4th 557, 614; see *People v. Valdez* (2004) 32 Cal.4th 73, 128 [motion for a mistrial "should only be granted when a defendant's 'chances of receiving a fair trial have been irreparably damaged'"].) A trial court's ruling on a motion for a new trial is also reviewed for abuse of discretion. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108.)

Here, the trial court acted well within its discretion in finding that the jury had not been prejudiced. Following the incident during playback, the court admonished the jurors not to be influenced by any outburst they may have witnessed during the playing of the 911 tape. It then inquired whether any juror would be influenced "in any way whatsoever" or would biased against defendant. No juror indicated that he or she would be influenced or biased. Under these circumstances, and considering the presumption that the jury followed the court's admonishment (*People v. Avila* (2006) 38 Cal.4th 491, 575), we conclude that the trial court did not error in denying the motions for a mistrial and a new trial.

4.    *Use of Defendant's Prior Juvenile Adjudication*

The operative information alleged that defendant had suffered one prior strike (§§ 667, subd. (d), 1170.12, subd. (b)) in 2000 while he was a juvenile. Defendant contends the use of his prior juvenile adjudication, in which he had no right to a jury trial, to enhance his adult criminal sentence in this case violates his constitutional rights under the Sixth and Fourteenth Amendments to the United States Constitution.

Defendant concedes the California Supreme Court rejected this argument in *People v. Nguyen* (2009) 46 Cal.4th 1007 (*Nguyen*). Defendant maintains that *Nguyen* was wrongly decided and has since been eroded by *People v. Gallardo* (2017) 4 Cal.5th 120, *Mathis v. United States* (2016) 136 S.Ct. 2243, and *Descamps v. United States* (2013) 570 U.S. 254.

These cases have not overruled *Nguyen* or analyzed the propriety of a sentencing court's use of a prior juvenile adjudication to increase a sentence in an adult criminal trial. As an intermediate appellate court, we must follow the Supreme Court's ruling in *Nguyen*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Doing so here, we conclude the use of defendant's juvenile adjudication to enhance his sentence in this case did not run afoul of the Sixth or Fourteenth Amendment.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, Acting P. J.

We concur:

COLLINS, J.                    CURREY, J.

18